

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

_____

**Signed January 20, 2010**                    **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 07-41650-DML7** |
| **TEXAS WYOMING DRILLING, INC.,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | **(Converted from Chapter 11)** |
| | § | |
| | § | |
| **JOHN DEE SPICER, TRUSTEE FOR** | § | |
| **TEXAS WYOMING DRILLING, INC.,** | § | |
| | § | **Adversary Proceeding** |
| Plaintiff, | § | |
| | § | **Case No. 09-04015-DML** |
| v. | § | |
| | § | |
| **LAGUNA MADRE OIL AND GAS II,** | § | |
| **LLC,** *et al* | § | |
| | § | |
| Defendants. | § | |
| | § | |

Memorandum Opinion – Page 1

| | |
|---|---|
| IN RE: §<br>§<br>LORI LYN RANZINO-RENDA, §<br>§<br>Debtor. §<br>§ | Case No. 06-43165-DML<br><br>Chapter 11 |

| | |
|---|---|
| LORI LYN RANZINO-RENDA, §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>SULLIVAN & COOK, LLC, fka §<br>SULLIVAN PARKER & COOK, LLC, §<br>JEFFREY E. COOK, individually, §<br>§<br>Defendants. §<br>§ | Adversary Proceeding<br><br>Case No. 08-04020-DML |

### Memorandum Opinion

The above-styled adversary proceedings require that the court address the issue of preservation of standing to pursue claims post-confirmation in a confirmed plan.[1] Because each of the cases differs significantly in operative facts, treatment of the cases in one memorandum opinion offers an opportunity for the court to provide a more comprehensive presentation of its views. *See* FED. R. BANKR. P. 9014(c) and 7042, incorporating FED. R. CIV. P. 42(a).

**TWD**

Before the court is *Defendants' Motion for Summary Judgment* (the "TWD Motion") filed by defendants Luguna Madre Oil and Gas II, LLC; Paloma Ventures; Stephen L. Danchok; Garth Stanger, Trustee of the Stanger Family Trust; William E.

---

[1] In the Texas Wyoming Drilling, Inc. ("TWD") adversary, the TWD Defendants (as defined below) also raise issues of claim preclusion that are dealt with below. Although the Cook Defendants (as defined below) have not argued issue preclusion, the court would not alter its ruling if they had.

Walthers; Donald Anderson, Trustee of the Anderson Living Trust; Trustee of the Dale & Carolyn Hanst Trust; Eric Kiersh; Michael Humphrey, Trustee of the Humphrey Family Trust; Wade Vessey; Karen Vessey; Keith Hanst; Leo Hanly; and Dan Peters (collectively, the "TWD Defendants"). By the TWD Motion, the TWD Defendants request summary judgment in the underlying adversary proceeding (the "TWD Adversary") initiated by TWD. TWD filed *Plaintiff's Response and Brief in Opposition to Defendants' Motion for Summary Judgment* (the "TWD Response") in opposition to the TWD Motion. Prior to court consideration of the TWD Motion, TWD's case was converted from chapter 11 to chapter 7, and John D. Spicer was appointed as trustee (the "Trustee") and substituted as plaintiff.

The court then requested that the parties address whether conversion of TWD's case and appointment of the Trustee should affect disposition of the TWD Motion. The TWD Defendants responded to the court's request with *Defendants' Memorandum of Legal Authorities Regarding the Lack of Any Effect on Defendants' Affirmative Defenses Alleged Herein Due to the Conversion of the Debtor's Bankruptcy Case from Chapter 11 to Chapter 7* (the "TWD Memorandum"). The Trustee filed *Plaintiff's Response to Defendants' Memorandum of Legal Authorities Regarding the Lack of Any Effect on Defendants' Affirmative Defenses Alleged Herein Due to the Conversion of the Debtor's Bankruptcy Case from Chapter 11 to Chapter 7* (the "Trustee Response") in response to the TWD Memorandum. The court held a hearing on the TWD Motion on November 16, 2009 (the "TWD Hearing"). During the TWD Hearing, counsel for the TWD Defendants and counsel for the Trustee appeared and delivered argument. The Trustee and the TWD Defendants have submitted summary judgment evidence in the form of copies of

*Debtor's First Amended Plan of Reorganization* (the "TWD Plan") and of the *First Amended Disclosure Statement under 11 U.S.C. § 1125 in Support of Debtor's Plan of Reorganization, as Modified* (the "TWD Disclosure Statement") and related documents. The court also has before it a brief filed after the TWD Hearing by the TWD Defendants on the significance to the disposition of the TWD Motion of *Kane v. National Union Fire Ins. Co.*, 535 F.3d 380, 385-86 (5th Cir. 2008).[2]

**Lori Lyn Ranzino-Renda ("Ranzino-Renda")**

Also before the court is the *Motion and Supporting Brief of Defendants Sullivan & Cook, LLC and Jeffrey E. Cook to Dismiss for Want of Standing and Subject-Matter Jurisdiction* (the "Cook Motion" and, together with the TWD Motion, the "Motions") filed by defendants Sullivan & Cook, LLC, fka Sullivan Parker & Cook, LLC (the "Cook Firm") and Jeffrey E. Cook ("Cook" and, together with the Cook Firm, the "Cook Defendants"). By the Cook Motion, the Cook Defendants seek dismissal of the underlying adversary proceeding (the "Ranzino-Renda Adversary") initiated by Ranzino-Renda. Ranzino-Renda filed *Plaintiff, Lori Ranzino-Renda's* [sic] *Opposition to the Sullivan & Cook, LLC and Jeffrey E. Cook's Defendants' Motion and Memorandum in Support of Motion to Dismiss Plaintiff's Amended Complaint for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1)* (the "Ranzino-Renda Response") in opposition to the Cook Motion.[3] The court, with the approval of the parties, did not conduct a hearing on the Cook Motion.[4]

---

[2] The TWD Defendants did not seek leave to file the brief respecting *Kane*, and the court did not otherwise grant leave to file the brief. The Trustee sought leave to file a response to the TWD Defendants, which the court denied.

[3] In the Ranzino-Renda Adversary, Ranzino-Renda also pressed claims against Teresa Campbell ("Campbell") and Flynn Campbell & Francis, LLP (together with Campbell, the "Campbell Defendants").

These matters are subject to the court's jurisdiction under 28 U.S.C. §§ 1334(b) and 157(b)(2)(H)[5] and 157(b)(2)(O) and 157(c). This memorandum opinion embodies the court's findings and conclusions with respect to the Motions. FED. R. BANKR. P. 7052.

## I.    Background

### A.    TWD

TWD filed its voluntary bankruptcy petition under chapter 11 of the Bankruptcy Code (the "Code")[6] on April 16, 2007 (the "Petition Date"), initiating the underlying bankruptcy case (the "TWD Case"). Following commencement of the TWD Case, TWD served as debtor-in-possession pursuant to Code § 1107. The TWD Plan was confirmed on November 13, 2008. Thereafter, on December 15, 2008, the TWD Plan became effective.

TWD subsequently filed a complaint against each of the TWD Defendants,[7] and the multiple resulting adversary proceedings were consolidated into the TWD Adversary on April 28, 2009. In its complaints, TWD alleged that each of the TWD Defendants

---

The court dismissed the claims against the Campbell Defendants by separate order but will explain its decision to do so below.

[4] The court commenced trial of the Ranzino-Renda Adversary on November 24, 2009. On November 29, 2009, which was to be the third day of the trial, the Campbell Defendants moved to dismiss the claims against them for want of jurisdiction, and the court (as discussed above) granted that motion. At that time, the Cook Defendants indicated they intended to urge a similar motion. By agreement of the parties, the court adjourned the trial pending the filing and disposition of the Cook Motion.

[5] Section 157(b)(2)(H) applies to the TWD Adversary. Though the court's core jurisdiction extends to the fraudulent transfer claims made in the TWD Adversary, the TWD Defendants have requested a jury, and at this time this court therefore lacks ability to try the TWD Adversary. *See* 28 U.S.C. § 157(e).

[6] 11 U.S.C. §§ 101, *et seq.*

[7] A complaint against each of the following was filed on January 15, 2009: Luguna Madre Oil and Gas II, LLC; Paloma Ventures; Stephen L. Danchok; Garth Stanger, Trustee of the Stanger Family Trust; and William E. Walthers. A complaint against each of the following was filed on March 5, 2009: Donald Anderson, Trustee of the Anderson Living Trust; Trustee of the Dale & Carolyn Hanst Trust; Eric Kiersh; Michael Humphrey, Trustee of the Humphrey Family Trust; Wade Vessey and Karen Vessey; Keith Hanst; and Leo Hanly. A complaint against Dan Peters was filed on April 15, 2009. Each complaint resulted in a separate adversary proceeding.

received dividends from TWD while TWD was insolvent prior to the Petition Date for which the TWD Defendants failed to provide to TWD reasonably equivalent value. Thus, TWD claimed that the dividend payments were fraudulent transfers and therefore avoidable under Texas law and Code §§ 544 and 548.

The TWD Defendants filed the TWD Motion on June 8, 2009.  In the TWD Motion, the TWD Defendants claim that TWD's fraudulent transfer claims (the "TWD Claims") are barred for the following reasons: 1) TWD lacked standing to pursue the TWD Claims because it failed to preserve such as to the TWD Claims with adequate language in the TWD Plan; 2) TWD was prohibited from pursuing the TWD Claims under the doctrine of judicial estoppel; and 3) the TWD Claims are barred from being brought by the doctrine of res judicata.

The TWD Hearing was originally scheduled to take place on July 15, 2009, but the court, *sua sponte*, converted the case to chapter 7 on July 14, 2009, because TWD had materially defaulted under the terms of the TWD Plan.  *See* Code § 1112(b)(4)(N). Consequently, the TWD Hearing was rescheduled for September 9, 2009.  Following the conversion to chapter 7, the Trustee was appointed.  The Trustee thereafter substituted as plaintiff in the TWD Adversary.  The TWD Hearing was again rescheduled because the court determined that the TWD Defendants and the Trustee should address the impact of the conversion on the various issues raised by the TWD Defendants in the TWD Motion. This prompted filing of the TWD Memorandum and the Trustee Response.  Counsel for the TWD Defendants and counsel for the Trustee presented argument at the TWD Hearing on November 16, 2009.

The TWD Plan, in relevant part, provided for "Retention of Causes of Action."
Section 12.18 of the TWD Plan. That section states that "[t]he Reorganized Debtor shall
retain all rights, claims, defenses, and causes of action including, but not limited to, the
Estate Actions." Estate Actions are defined in the TWD Plan at Annex 1 to Plan at ¶ 39
as:

> any and all claims, causes of action and enforceable rights of the
> Debtor against third parties, or assertable by the Debtor on behalf
> of creditors, its estate, or itself . . . for recovery or avoidance of
> obligations, transfers of property or interests in property . . . and
> other types or kinds of property or interests in property . . .
> recoverable or avoidable pursuant to Chapter 5 or other sections of
> the Bankruptcy Code or any applicable law.

### B. Ranzino-Renda

Ranzino-Renda filed her voluntary bankruptcy petition under chapter 13 of the
Code on September 21, 2006, which initiated the underlying bankruptcy case (the
"Ranzino-Renda Case"). On November 16, 2006, the Ranzino-Renda Case was
converted to chapter 11. The *Second Amended Plan of Reorganization, As Modified* (the
"Ranzino-Renda Plan" and, together with the TWD Plan, the "Plans") was confirmed on
October 4, 2007. Thereafter, the Ranzino-Renda Plan became effective on December 10,
2007.

Ranzino-Renda filed a complaint against the Cook Defendants on February 12,
2008. Ranzino-Renda later amended her complaint to include the Campbell Defendants.
The complaint initiated the Ranzino-Renda Adversary. Following preliminary hearings
which disposed of certain of Ranzino-Renda's claims, in her second amended complaint,
Ranzino-Renda alleged that the Cook Defendants and the Campbell Defendants breached
their contracts to provide her with legal services; that Cook and Campbell breached their

duty of care as attorneys for Ranzino-Renda and committed legal malpractice stemming from their failure to properly: 1) control funds entrusted to them by Ranzino-Renda; 2) notify Ranzino-Renda of withdrawal as counsel in certain prepetition litigation; 3) give advice, opinion, or other relevant information; and 4) handle certain litigation that Ranzino-Renda was involved in prepetition.

The Cook Defendants filed the Cook Motion on December 7, 2009. In the Cook Motion, the Cook Defendants assert that the court lacks jurisdiction over the Ranzino-Renda Adversary because Ranzino-Renda lacks standing to pursue the causes of action (the "Ranzino-Renda Claims") asserted in the Ranzino-Renda Adversary because she failed to preserve standing as to them in the Ranzino-Renda Plan.

The Ranzino-Renda Plan provides for the vesting of assets in Ranzino-Renda under section 7.1. That section states that "all real and personal property of the estate . . . including but not limited to all causes of action . . . and any avoidance actions . . . shall vest in [Ranzino-Renda]." The *Amended Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code in Connection with Debtor's Second Amended Plan of Reorganization* (the "Ranzino-Renda Disclosure Statement") identifies litigation claims that were listed in her previously-filed Schedule B. *See* Code § 521; FED. R. BANKR. P. 1007(b). Specifically, the Ranzino-Renda Disclosure Statement, in section K (*Risks to Creditors under the Plan*) at ¶5e, contains the following language describing litigation Ranzino-Renda intended to pursue post-confirmation to pay her creditors:

> *Claims Against Sullivan, Parker & Cook, L.L.C., Jeffrey Cook, and J. Todd Key (together the "SPC Defendants").*
> The Debtor's claims and causes of action against the SPC Defendants arise out of the SPC Defendants acts and omissions as Debtor's attorney . . . and include but are not limited to claims of DTPA, negligence, breach of

> contract, misrepresentation and fraud. The Debtor seeks
> claims for both actual and consequential damages,
> reasonable and necessary attorney's fees, exemplary
> damages, and prejudgment and postjudgment interest. . . .
> Under the Plan, the Debtor retains the right to prosecute
> any of the foregoing claims until such time as the Debtor
> determines in her reasonable business judgment that such
> claims are burdensome to the Reorganized Debtor or are of
> inconsequential value and benefit to the Reorganized
> Debtor.

The Ranzino-Renda Plan did not specifically describe any claim against Cook, the Cook

Firm, or the Campbell Defendants.  The Ranzino-Renda Disclosure Statement made no

mention of any potential claim against the Campbell Defendants.

**II.    Issues**

The Motions present the following issues:

1)    Did TWD preserve its standing to pursue the TWD Claims post-
      confirmation through appropriate language in the TWD Plan or the
      TWD Disclosure Statement?

2)    Assuming, *arguendo*, that the TWD Plan lacks sufficient language to
      preserve the TWD Claims for pursuit by TWD, does the Trustee
      nonetheless have standing to pursue the TWD Claims as a result of the
      conversion of the TWD Case to chapter 7?

3)    Is the Trustee judicially estopped from pursuing the TWD Claims?

4)    Are the TWD Claims barred from being pursued by the doctrine of res
      judicata?

5)      Did Ranzino-Renda preserve her standing to pursue the Ranzino-Renda

Claims through appropriate language in the Ranzino-Renda Plan or the

Ranzino-Renda Disclosure Statement?

Although the TWD Motion might be disposed of by addressing fewer than all issues

presented, the court, in the interests of judicial economy, will at this time consider and

rule on all the foregoing questions.

## III.    Contentions of the Parties

### A.    The TWD Defendants

The TWD Defendants maintain that TWD failed to adequately preserve standing

to pursue the TWD Claims because the language in the TWD Plan is insufficient to meet

the requirements of applicable case law.  Thus, the TWD Defendants assert that TWD

had no standing to pursue the TWD Claims against the TWD Defendants and that the

Trustee, as successor to TWD, similarly lacks standing to pursue the TWD Claims.

In the TWD Memorandum, the TWD Defendants argue that the conversion to

chapter 7 had no effect on the proper application of any of the theories raised in the TWD

Motion.  The TWD Defendants insist that the Trustee stands solely in the shoes of TWD

as they existed at the time of conversion and that the Trustee is bound by all actions (or

omissions) of TWD.

The TWD Defendants assert that TWD is judicially estopped from pursuing the

TWD Claims post-confirmation because, the TWD Defendants claim, TWD represented

that no such claims existed prior to confirmation of the TWD Plan.  The TWD

Defendants state that TWD's post-confirmation position that the TWD Claims exist

against the TWD Defendants is inconsistent with positions taken by TWD pre-

confirmation and that, under the doctrine of judicial estoppel, it would be inequitable to permit TWD, and therefore the Trustee, to assert the TWD Claims.

Finally, the TWD Defendants maintain that the TWD Claims are barred as res judicata because the TWD Claims were not raised pre-confirmation.  The TWD Defendants argue that TWD could (and should) have raised the TWD Claims before the TWD Plan was confirmed, and because it failed to do so, all such claims are now barred, having been resolved through the order confirming the TWD Plan.

### B.     The Trustee

The Trustee, as substitute plaintiff for TWD following conversion to chapter 7, responds that the language in the TWD Plan is sufficient to preserve the TWD Claims for pursuit by TWD and subsequently by the Trustee as successor to TWD.  The Trustee maintains that the inclusion in the TWD Plan or elsewhere of appropriate language is dispositive of each of the defenses raised by the TWD Defendants.  Thus, the Trustee insists that he has standing to pursue the TWD Claims, that he is not judicially estopped from pursuing the TWD Claims, and that the TWD Claims are not barred as res judicata.

### C.     The Cook Defendants

The Cook Defendants ask the court to dismiss the Ranzino-Renda Adversary pursuant to FED. R. CIV. P. 12(b)(1) (applicable in the Ranzino-Renda Adversary pursuant to FED. R. BANKR. P. 7012) on the ground that the Ranzino-Renda Plan lacked sufficiently specific language regarding the Ranzino-Renda Claims and so failed to preserve the causes of action for pursuit by Ranzino-Renda.  Thus, the Cook Defendants argue that Ranzino-Renda lacks standing to pursue the Ranzino-Renda Claims and that

this court is therefore without subject-matter jurisdiction to hear the Ranzino-Renda Adversary.

### D.    Ranzino-Renda

Ranzino-Renda asserts that the Ranzino-Renda Plan and the Ranzino-Renda Disclosure Statement must be considered together in determining whether the Ranzino-Renda Claims were properly preserved for pursuit by Ranzino-Renda following confirmation of the Ranzino-Renda Plan.  Ranzino-Renda argues that the Ranzino-Renda Plan and the Ranzino-Renda Disclosure Statement, when considered together, properly preserved the Ranzino-Renda Claims for pursuit by Ranzino-Renda against the Cook Defendants.  Ranzino-Renda argues that, consequently, she has standing to pursue the Ranzino-Renda Claims.

## IV.    Standards

Though the TWD Motion and the Cook Motion pose similar issues,[8] they do so by different procedural devices.  The Cook Motion seeks dismissal of the Ranzino-Renda Adversary, while the TWD Motion asks for summary judgment.  The distinction, however, makes no difference to the court's consideration of the Motions.  Just as is true with a summary judgment, in considering dismissal for want of jurisdiction, a court may look beyond the pleadings.  *See Montez v. Dep't of Navy*, 392 F.3d 147, 149 (5th Cir. 2004).  Likewise, if the TWD Adversary should be dismissed for want of jurisdiction, the TWD Motion is sufficient to warrant the same relief.[9]

### A.    Summary Judgment Standard

---

[8] Both of the Motions raise the issue of standing to bring suit post-confirmation.

[9] A motion to dismiss for want of jurisdiction, however, would have been more appropriate.  *See Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986); FED. R. CIV. P. 12(b)(1).

Federal Rule of Civil Procedure 56 applies in adversary proceedings.  FED. R. BANKR. P. 7056.  Summary judgment is proper when the "pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  An issue is genuine only if there is an adequate evidentiary basis on which a reasonable fact finder could find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute is material only if it might affect the outcome of the suit under governing law.  *Id*.  The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact. *Id*. at 256-57.  The court must view all the evidence in the light most favorable to the nonmoving party. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

Filing a properly supported motion for summary judgment has the effect of shifting the burden to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir. 2002). The respondent may not rely on allegations or denials alone; rather, the respondent must set forth specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The facts pertinent to the TWD Motion are not subject to dispute.  Rather, the parties disagree about the effect or effectiveness of language in the TWD Plan.

**B.      Rule 12(b)(1) Jurisdictional Standard**

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). "'A case is properly dismissed for lack of jurisdiction when the court lacks statutory or constitutional power to adjudicate the case.'" *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998) (quoting *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996)).  Again, as is true of the TWD Motion, the parties disagree about the effect of the language in the Ranzino-Renda Plan and the effect of the Ranzino-Renda Disclosure Statement.

## V.      Discussion

Standing, raised by both Motions, is a jurisdictional issue, while judicial estoppel and the doctrine of res judicata, urged by the TWD Defendants, effect issue preclusion. However, each has been used by the courts to prevent pursuit of claims post-confirmation by a successor to a bankruptcy debtor.  In applying each of the absence of standing, judicial estoppel, and res judicata, the courts have expressed concern that allowing the barred suit to proceed would allow a debtor or its successor, by failing to disclose its intent to press the barred suit following confirmation, either to benefit itself or blind-side one of the parties to its bankruptcy.  *See, e.g.*, *In re United Operating*, 540 F.3d 351, 355 (5th Cir. 2008) (determining that specific and unequivocal language is essential to put creditors on notice to allow those creditors "to determine whether a proposed plan resolves matters satisfactorily before they vote to approve it"); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, 179 F.3d 197, 206 (5th Cir. 1999) (stating that judicial estoppel is "applied where intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice"); *Eubanks v.*

*FDIC*, 977 F.2d 166, 174 (5th Cir. 1992) (holding that res judicata applied where a debtor knew of claims but failed to bring them to the attention of the bankruptcy court or the creditors as mandated by the Code).

In the cases at bar, the claims the Trustee and Ranzino-Renda seek to pursue are intended to benefit creditors.  Moreover, whatever the text of the TWD Plan or the Ranzino-Renda Plan, as discussed below, neither of the debtors made a secret of the intended pursuit of the TWD Defendants or the Cook Defendants.  In these circumstances, the court believes caution is in order in applying the words chosen by appellate courts to describe the operation of various mechanisms argued in the Motions as it might construe the language of a statute.  It does not seem to the court consistent with the objectives of the appellate courts to apply the applicable precedents in so draconian a fashion as to disserve the interests of creditors and frustrate pursuit of claims which may have merit.  The court thus approaches the issues presented to it assuming that it was not the intention of the courts deciding the cases cited by the TWD Defendants and the Cook Defendants that their opinions would be too readily usable by defendants to defeat the legitimate expectations of a debtor's creditors for recovery.

### A.    Standing

### 1.    Language in the Plans

From commencement of the TWD Case until the TWD Plan became effective, TWD operated as a debtor-in-possession.  The role of debtor-in-possession entitled TWD to exercise most of the powers of a bankruptcy trustee.  Code § 1107(a).  Chief among these powers, for the purposes of this opinion, is the power to avoid fraudulent transfers on behalf of the estate.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1100.08[3] (16th ed. 2009).

But once the TWD Plan became effective, the estate terminated, and TWD's status as debtor-in-possession disappeared along with the estate. *See* Code § 1101(1); *United Operating*, 540 F.3d at 355.[10] Unless TWD took appropriate steps to preserve its ability to pursue the TWD Claims, TWD's authority to avoid fraudulent transfers therefore ceased once the TWD Plan became effective. *See United Operating*, 540 F.3d at 355.

The Code permits a plan to "provide for the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any" claim belonging to the estate. *See* Code § 1123(b)(3)(B). The Fifth Circuit Court of Appeals has held that a debtor may only continue to enforce a claim previously held by the estate after confirmation if the claim was retained by the plan. *United Operating*, 540 F.3d at 355 (citing *In re Paramount Plastics, Inc.*, 172 B.R. 331, 333 (Bankr. W.D. Wash. 1994)). The Court explained that, in order for a claim to be retained by a plan, the plan must include language retaining it that is "specific and unequivocal." *Id.* (citing *Harstad v. First American Bank*, 39 F.3d 898, 901 (8th Cir. 1994); *In re Ice Cream Liquidation, Inc.*, 319 B.R. 324, 337-38 (Bankr. D. Conn. 2005)).

The Court of Appeals in *United Operating* explained that specific and unequivocal language in a plan is necessary to secure the prompt and effective administration of the case. *United Operating*, 540 F.3d at 355. The Court further explained that such language in a plan is essential to put creditors on notice of any claim that the debtor wishes to pursue after confirmation. *Id.* "Proper notice allows creditors to determine whether a proposed plan resolves matters satisfactorily before they vote to

---

[10] As discussed in greater detail below, in *United Operating*, the plan of reorganization did not provide for revesting of estate assets following confirmation. Code § 1141(b); *United Operating*, 540 F.3d at 354. As section 1141(b) "vests all property of the estate in the debtor," it is less the case, normally, that, according to the statute, the estate ceases to exist than that it is subsumed by the debtor.

approve it." *Id.* In other words, *United Operating* stands for the proposition that creditors

must be able to view a proposed plan and properly evaluate the creditors' benefits and

potential liabilities so that they may then consider that information when they vote to

approve or disapprove a plan. This is especially relevant when creditors are led to accept

less than 100 percent of amounts owed to them. Where assets such as potential lawsuits

are omitted from a plan, creditors, on the assumption that available assets to pay debt are

less than they are, are more likely to approve a plan under which they will receive less

than the full amount of what their claims would entitle them to outside of bankruptcy.[11]

The question remains as to the precise requirements of *United Operating*. What

does it mean for language to be "specific and unequivocal?" *United Operating* makes it

clear that a blanket reservation of "any and all claims" is insufficient to preserve rights to

pursue claims of the estate by the reorganized debtor.[12] But the fact that a blanket

---

[11] Where, as in the cases at bar, the lawsuits pursued post-confirmation are pursued for the benefit of the creditors, the possibility that they will provide an unanticipated dividend to those who passed on the plan of reorganization would seem to contradict this rationale as a basis for finding a want of standing. In *United Operating*, however, the defendant being pursued was a party in interest in the debtor's bankruptcy case that might have acted to block the plan had the potential claim against it been identified. *United Operating*, 540 F.3d at 354-56. In the TWD Case, none of the TWD Defendants were called upon to vote on the reorganization plan (the same is true of the Cook Defendants and the Campbell Defendants in the Ranzino-Renda Case). Thus, the expectations of creditors (and other interested parties) would not here seem to play the same part as in *United Operating*.

[12] The undersigned judge joins Chief Judge Barbara Houser in her concerns respecting *United Operating*. *See In re Manchester*, 2009 WL 2243592, *5, n.6 (Bankr. N.D. Tex.). The "bright-line rule announced by the Fifth Circuit in *United Operating*" operates to cause injustice to creditors in many cases though it is intended to operate for their benefit. *See id.* Taken to its logical conclusion, *United Operating* would seem to require that counterclaims and affirmative defenses, to say nothing of claims identified only through discovery after confirmation of the plan, be identified in the plan or be lost forever.

It is easy to imagine cases where identifying each potential claim, counterclaim, and affirmative defense would be so onerous as to create large inefficiencies and inevitable mistakes. Such a result is at odds with the direction that a debtor's reorganization should be prompt, efficient, and in the best interests of its creditors. *See In re Timbers of Inwood Forest Associates, Inc.*, 808 F.2d 363, 374 (5th Cir. 1987), *cert. granted United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 481 U.S. 1068 (1987), *aff'd* 484 U.S. 365 (1988); *United Operating*, 540 F.3d at 355. This court is concerned that *United Operating* could even encourage debtors to game the system and rob creditors of their potential recoveries from causes of action against, *inter alia*, insiders by including plan language that fails to meet the standard outlined in *United Operating*. Where a debtor attempts to game the system by failing to identify sufficiently the claims and then later pursues the claims for its own gain rather than on behalf of the

reservation is inadequate does not resolve the question.[13] Rather, a court must look to the purpose of the "specific and unequivocal" language requirement in order to determine if the language of a plan satisfies the standard. For purposes of this opinion, with respect to the TWD Motion, the court is required to determine whether the language in the TWD Plan provides sufficient notice regarding the TWD Claims to creditors entitled to vote on approval of the TWD Plan. The court, for reasons discussed below, concludes that the TWD Plan does, in fact, provide sufficient notice to those creditors entitled to vote on the TWD Plan.

The TWD Defendants argue that TWD failed to preserve the TWD Claims because TWD "did not identify any specific causes of action . . . against any named person." TWD Motion at 10. The TWD Defendants correctly cite to *United Operating* as the controlling case in the Fifth Circuit as to what is required for a debtor to preserve claims post-confirmation. But the TWD Defendants' interpretation of *United Operating* goes too far.

*United Operating* requires that a plan include "specific and unequivocal" language in order for a claim belonging to the bankruptcy estate to be enforced by a reorganized debtor after confirmation of the plan. *United Operating*, 540 F.3d at 355. But nowhere does *United Operating* state that the specific and unequivocal language

---

creditors, the equitable doctrine of judicial estoppel, which is discussed below, is an effective and sufficient tool for eliminating otherwise inequitable results. *Cf. Biesek v. Soo Line R.R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006)

[13] It is again worthy of note that *United Operating* involved a plan which, as the Court of Appeals pointedly noted (*United Operating*, 540 F.3d at 354), did not provide for vesting of estate property. While this distinction from the case at bar is significant—after all, the debtor in *United Operating* obviously should have identified those assets it was allocated to administer by the plan—the language of *United Operating* is certainly sufficiently broad to require more than a mere general reservation or a revesting provision to preserve standing to bring suit.

must include identification of specific claims against specific defendants.[14]  Quite the

contrary, *United Operating* cites with approval *In re Ice Cream Liquidation, Inc.*, in

which a categorical reservation of preference claims was considered sufficient by the

court to preserve standing.  The Fifth Circuit Court of Appeals thus has not required a

plan to identify specific individuals or entities as prospective defendants in order to

preserve the claims; rather, as appropriate, claims may be preserved by category.[15]  *See In*

*re Manchester, Inc.*, Slip Copy, 2009 WL 2243592 at *5, 51 Bankr.Ct.Dec. 262, (Bankr.

N.D. Tex.) (concluding that the holding of *United Operating* was based in part on the

rationale of *Ice Cream Liquidation* and that categorical reservations of voidable transfer

claims were, therefore, sufficiently specific).  The *Manchester* court determined that the

creditors in that case had to be told that avoidance actions would be pursued but that

individual, prospective defendants did not have to be identified in the plan.  *Id.*

The *Manchester* court determined that the confirmed plan in that case sufficiently

preserved the avoidance actions for pursuit by the litigation trustee because the plan's

language included retention of "any and all actions, claims, rights . . . whether asserted or

assertable directly, indirectly or derivatively . . . accruing to the Debtors (including the

---

[14] Indeed, it seems to the court that it might be argued that it is more the language of reservation—the scope and nature of the reservation—that must be specific and unequivocal than the precision of the description of the claims.  This interpretation of *United Operating* is consistent with both the Court's concern with notice of creditors and its reliance on *Ice Cream Liquidation*.

[15] In the present context, the court need not address any division that may exist between claims as to which standing may be preserved by category and those requiring more specific identification.  In cases like those at bar, however, where creditor recovery turns in part on the post-confirmation pursuit of claims, the court does not believe Chief Judge Edith Jones, author of *United Operating*, and a recognized expert in bankruptcy law, having even served on the National Bankruptcy Review Commission, would intend the decision to be construed broadly to the detriment of creditors.  Rather, given her obvious acquaintance with the difficulty of fully delineating causes of action and her reliance on *Ice Cream Liquidation*, the court concludes Chief Judge Jones intended to set a standard sufficiently flexible to ensure that value to plan constituencies was not lost inadvertently or through application of a "17th Century" test for pleadings and that a plan, as discussed below, would preserve to post-confirmation entities sufficient standing to carry out the plan in accordance with the reasonable expectations of interested parties affected by the plan.

Avoidance Actions)" and because it further defined "'Avoidance Actions' to mean any and all Causes of Action which a trustee, the Debtors, the Estates, or other appropriate party in interest [might] assert under sections, 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code." *Manchester*, 2009 WL 2243592 at * 4-5. The court concurs with this interpretation, and, contrary to the argument of the TWD Defendants, concludes that *United Operating* does not require that a plan name individual defendants and the specific claims against them that are being retained; at least avoidance claims may be described categorically.

Despite the fact that *United Operating* does not require a description in a plan of specific claims against named individuals, the TWD Defendants nonetheless encourage the court to find that the language of the TWD Plan is insufficient because the TWD Defendants did not have sufficient notice of the potential lawsuits against them at the time the TWD Plan was confirmed. The court finds the TWD Defendants' argument unpersuasive. The purpose of the specific and unequivocal language requirement is not to put potential defendants (at least those not voting on the plan) on notice of lawsuits that may be brought against them; rather, it is to put creditors that are entitled to vote on notice that there may be assets in the form of potential lawsuits so that they may pass on the plan with sufficient knowledge of the assets that are available to pay the claims held by the creditors against the debtor. *See United Operating*, 540 F.3d at 355. Consequently, the question of whether standing to pursue the TWD Claims post-confirmation has been preserved turns on whether the language in the TWD Plan was sufficient to put creditors on notice that TWD anticipated pursuing the TWD Claims after confirmation. The court holds that the TWD Plan language did provide such notice.

The TWD Defendants argue that the only provision in the TWD Plan that addresses the TWD Claims is the following statement: "Reorganized Debtor shall retain all rights, claims, defenses, and causes of action including, but not limited to, the Estate Actions." TWD Motion at 9 (quoting the TWD Plan at section 12.18).[16] The TWD Defendants find this statement comparable to the general claim reservation contained in *United Operating* where that Court held that the blanket language "'any and all claims' arising under the Code" was insufficient to preserve the claims that the reorganized debtor in that case sought to pursue. But the section of the TWD Plan containing the language quoted by the TWD Defendants, which goes much farther than that in *United Operating*, also contains additional language, which in relevant part, reads:

> On or before December 1, 2008, [Debtor] shall send to all recipients of potentially avoidable transfers under Sections 547 of the Bankruptcy Code and all recipients of any prepetition stock dividends paid by [Debtor] that are potentially subject to avoidance under Section 548 of the Bankruptcy Code (the "Applicable Avoidable Transfer Recipients") a letter agreement (the "Tolling Agreement") providing for the tolling of all applicable statutes of limitations during the time that [Debtor] is performing under the Plan (the "Tolled Period"). . . . If an Applicable Avoidable Transfer Recipient properly and timely executes the Tolling Agreement, [Debtor] will forbear from bringing suit against the Applicable Avoidable Transfer Recipient during the Tolled Period. . . . In the event of termination of any Tolling Agreement, [Debtor] or subsequent trustee of [Debtor's] estate thereafter shall have the later of (a) the applicable statutes [sic] of limitation, (b) sixty (60) days following the termination of the Tolled Period as provided herein, or (c) such other date as may be agreed in writing by the Applicable Avoidable Transfer Recipient to bring suit against

---

[16] Estate Actions are defined in the TWD Plan at Annex 1 to Plan ¶ 39 as:

> any and all claims, causes of action and enforceable rights of the Debtor against third parties, or assertable by the Debtor on behalf of creditors, its estate, or itself . . . for recovery or avoidance of obligations, transfers of property or interests in property . . . and other types or kinds of property or interests in property . . . recoverable or avoidable pursuant to Chapter 5 or other sections of the Bankruptcy Code or any applicable law.

> those respective Applicable Avoidable Transfer Recipients. . . .
> Nothing herein shall prevent [Debtor] from bringing suit against
> (a) any Applicable Avoidable Transfer Recipient who does not
> enter into a Tolling Agreement with [Debtor] by the deadlines set
> forth herein.

Plan at ¶12.18.

The court believes that the language in the TWD Plan in the present case provides

at least as much notice as the plan that was determined to preserve avoidance actions in

*Manchester*. The TWD Plan discusses the avoidable transfer claims and who would be

subject to such claims by defining "Applicable Avoidable Transfer Recipients." The

language of the TWD Plan clearly provides a categorical reservation of avoidance claims

and is sufficient to put creditors on notice that avoidance claims would be pursued. The

court agrees with the *Manchester* court and concludes that it was unnecessary for the

TWD Plan to identify particular individuals or entities that would be sued. The court

holds that the language establishing that avoidance claims would be pursued and the class

of persons that would be potential defendants sufficiently satisfies the "specific and

unequivocal" language requirement of *United Operating*.[17]

The Ranzino-Renda Plan, on the other hand, does not on its face satisfy the

*United Operating* standard with respect to the Ranzino-Renda Claims. The language in

the Ranzino-Renda Plan, as to the Ranzino-Renda Claims, is a clear example of a blanket

reservation that was deemed in *United Operating* to be insufficient to preserve for the

reorganized debtor claims that belonged to the bankruptcy estate. The only language in

the Ranzino-Renda Plan that provides for preservation of the Ranzino-Renda Claims is

the "Vesting of Assets" provision included in section 7.1, which states in relevant part

---

[17] Indeed, even without the language respecting tolling agreements, the court would hold the generic
reservation of the ability to pursue Estate Actions, as defined, sufficient under *Manchester* and *United
Operating*.

that "all real and personal property of the estate . . . including but not limited to all causes of action . . . and any avoidance actions . . . shall vest in [Ranzino-Renda]."  Despite its attempt to reserve "all causes of action . . . and any avoidance actions," this language fails to identify the Ranzino-Renda Claims with any degree of specificity. [18]  It wholly fails even to include a categorical reservation of the Ranzino-Renda Claims and so fails to satisfy the requirements of *United Operating* or *Ice Cream Liquidation*.  But the failure of the Ranzino-Renda Plan to include the necessary language does not wholly dispose of the question.  For reasons given below, the court concludes that Ranzino-Renda may nonetheless pursue the Ranzino-Renda Adversary against the Cook Defendants.

**2.      Language in the Disclosure Statements**

The court must therefore consider whether language in a disclosure statement may be used to supplement the language in a plan to meet the "specific and unequivocal" language requirement of *United Operating*.  Contract rules of interpretation apply to bankruptcy plans.  *See In re U.S. Brass Corp.*, 301 F.3d 296, 307 (5th Cir. 2002); *Official Creditors Comm. of Stratford of Tex., Inc. v. Stratford of Tex., Inc. (In re Stratford of Tex., Inc.)*, 635 F.2d 365, 368 (5th Cir. 1981).  A contract should be construed to effect the intent of the parties. *See Newby v. Enron Corp. (In re Enron Corp. Securities)*, 391 F.Supp.2d 541, 567-68 (S.D. Tex. 2005).  To the extent that they pertain to the same transaction, all writings respecting that transaction are considered together in ascertaining intent even if the writings were executed at different times without specific reference to each other.  *Neal v. Hardee's Food Sys., Inc.*, 918 F.2d 34, 37 (5th Cir. 1990).  Thus, in a

---

[18] The court notes that if the Ranzino-Renda Claims were avoidance actions the categorical identification of such actions might be sufficient.  But the Ranzino-Renda Claims are based on a different type of cause of action, and the Ranzino-Renda Claims are not identified anywhere in the Ranzino-Renda Plan by category or otherwise.

bankruptcy case, a plan and disclosure statement may be considered together to determine the intent of the parties.[19]  *See Floyd v. CIBC World Markets, Inc.*, 2009 WL 2633791, *8 (S.D. Tex.).

Courts have looked to a confirmed plan, together with its accompanying disclosure, to determine the sufficiency of reservation of claims.  *See id.*; *Browning v. Levy*, 283 F.3d 761, 774 (6th Cir. 2002).  Looking at a plan and disclosure statement together is in line with the general contract principle that documents forming part of the same transaction are to be read together.  *See This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998); *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 107 (3d Cir. 1986).  In the present cases, even if the TWD Plan or the Ranzino-Renda Plan fails, by itself, to preserve causes of action through inclusion of sufficient language to meet the requirements of *United Operating*, the court may look to the TWD Disclosure Statement and to the Ranzino-Renda Disclosure Statement to clarify whether the intent of the underlying plan—and its effect—was to retain standing to pursue a given cause of action.

Reference to a disclosure statement for such clarification of the underlying plan makes good sense.  A disclosure statement, typically more detailed than the plan, fixes the expectations of the parties.[20]  Thus, a detailed description—whether by category of suit or by listing of specific defendants and claims—in a disclosure statement, coupled

---

[19] Indeed, the peculiar character of a disclosure statement—a document the court approval of which is a necessary prerequisite to dissemination of the plan—suggests it should have extra relevance to construction of the plan itself.  Under FED. R. BANKR. P. 3017(d)(1), creditors may even receive just the disclosure statement and a summary of the plan.  Given the focus of the *United Operating* court—and the cases applying judicial estoppel or the doctrine of res judicata to bar post-confirmation suits—on informing creditors of what to expect under the plan, the importance and critical role of the disclosure statement is clear, and its significance and usefulness in parsing the underlying plan is unquestionable.

[20] What a plan proponent (in each case at bar, the debtor) and creditors *expected* would occur pursuant to a plan is tantamount to their intent.  As the plan is to be construed like a contract, it is the court's duty to give effect to the intent of the parties—in the case of a plan, the proponent and those bound by or at least voting on the plan.

with a revesting and reservation of claims for the benefit of creditors provision in the plan itself will cause creditors and interest holders to see pursuit of those claims as a part of the post-confirmation performance of the plan by the reorganized debtor or other successor to the estate. If creditors sought in the bankruptcy court relief in the form of an action to force a debtor to pursue a claim as a necessary part of that debtor's performance of the plan, the court could—and very likely would—look to the disclosure statement as a basis for determining creditor expectations. If the court concluded that, based on the plan and disclosure statement, performance by the debtor required pursuit of a given claim, it would order the debtor to pursue that claim in accordance with Code § 1142(a). Surely, if a debtor under such circumstances would be under a duty to pursue a claim in performance of the plan, the revesting and reservation provision on which that performance rests would be sufficient to support standing, despite any relative want of specificity of description in the plan itself.

In the TWD Case, even if the TWD Claims were not sufficiently described in the TWD Plan to put creditors on notice, the TWD Disclosure Statement identifies several potential defendants by name as well as providing a categorical identification of unnamed potential defendants.[21] TWD Disclosure Statement at section VI.E. Additionally, the TWD Disclosure Statement provides an estimate of the dollar amount (approximately $5.2 million) of the TWD Claims as well as potential barriers to recovery. *Id*. Thus, even were the TWD Plan alone inadequate to preserve standing to pursue the TWD Defendants, the TWD Disclosure Statement provides creditors and others with sufficient notice and the clear expectation that the claims for recovery of dividends paid to the

---

[21] The TWD Disclosure Statement also ties back to its Statement of Financial Affairs ("SOFA"), as discussed below.

TWD Defendants were being preserved potentially to be pursued—as part of TWD's performance—post-confirmation.

The court has already observed that the Ranzino-Renda Plan presents a different situation. Standing alone, the Ranzino-Renda Plan does not satisfy the requirements of *United Operating*. Considering the Ranzino-Renda Disclosure Statement, however, the court concludes that creditors reading it and the underlying plan would expect Ranzino-Renda to pursue the Cook Defendants post-confirmation in her performance of that plan.

The Ranzino-Renda Disclosure Statement, unlike the Ranzino-Renda Plan, goes well beyond a blanket reservation of claims. Indeed, the Ranzino-Renda Disclosure Statement identifies the Cook Defendants by name and identifies the basis for the causes of action against them. If the issue were so presented to the court, it would hold that Ranzino-Renda was required, in her performance of the Ranzino-Renda Plan, to pursue the Ranzino-Renda Claims. On the basis of the Ranzino-Renda Disclosure Statement, the Cook Motion must be denied.

Conversely, the Ranzino-Renda Disclosure Statement was silent as to Campbell Defendants, and the court thus determined that neither the Ranzino-Renda Plan nor the Ranzino-Renda Disclosure Statement provided for the preservation of any claims against Campbell Defendants. As a result, the court dismissed Campbell Defendants from the Ranzino-Renda Adversary.[22]

---

[22] Although Ranzino-Renda argued that her causes of action against the Campbell Defendants were only identified after discovery commenced in the Ranzino-Renda Adversary, the court need not here determine whether a failure to identify an unknown cause of action would, under *United Operating*, result in the loss of standing to pursue it. In Ranzino-Renda's case, the relationship between Ranzino-Renda and Campbell was certainly known to Ranzino-Renda when the Ranzino-Renda Plan was formulated. Also, Ranzino-Renda was obviously aware of Campbell's acquaintance with and confidence in Cook. Finally, Ranzino-Renda knew that she had potential claims against various professionals who represented her prepetition (the Ranzino-Renda Disclosure Statement mentions several besides the Cook Defendants). Certainly, this knowledge was sufficient to require reservation of potential claims against the Campbell Defendants—or at

### 3. Effect of Conversion to Chapter 7 on the Trustee's Standing

Even if TWD failed to meet the *United Operating* standard to retain for itself

standing to pursue the TWD Claims, the court must consider the effect of the conversion

to chapter 7 and the substitution of the Trustee as the plaintiff in the TWD Adversary. It

is important to remember that standing is an issue of *who may bring suit* and not an issue

of *whether a viable suit exists*. *See* 15 *Moore's Federal Practice*, § 101.20 (Matthew

Bender 3d ed. 2009). When a plaintiff lacks standing to bring a case, it is not dispositive

of whether the case may be brought at all. Standing is not a doctrine of claim preclusion;

it is an issue of who is entitled to enforce a claim. Thus, even if the TWD Defendants are

correct in their contention that TWD lacked standing to pursue the TWD Claims, it does

not translate to the conclusion that the Trustee is also barred from enforcing the TWD

Claims.

At all times during the pendency of the TWD Case, the TWD Claims have

belonged to the bankruptcy estate and not to TWD. *See* Code §§ 541, 550, and 548; *In re*

*Advanced Modular Power Systems, Inc.*, 413 B.R. 643, 675 (Bankr. S.D. Tex. 2009).

While TWD acted as debtor-in-possession, it was entitled to enforce the TWD Claims on

behalf of the bankruptcy estate for the benefit of the unsecured creditors. *See id.*

Because the bankruptcy estate ceased to exist at confirmation of the TWD Plan, TWD's

ability to pursue the TWD Claims arguably ceased at that time unless language in the

TWD Plan preserved TWD's right to enforce them. *See United Operating*, 540 F.3d at

---

least a categorical reservation of claims against Ranzino-Renda's prepetition professionals. *Cf. In re*
*National Benev. Ass'n of the Christian Church (Disciples of Christ)*, 333 Fed.Appx. 822 (5th Cir. 2009).
The court therefore concludes that Ranzino-Renda was sufficiently on notice of possible claims against the
Campbell Defendants that she could reasonably be required to identify them, at least by category, in
connection with her plan.

355.  The question, then, is whether a trustee appointed in a chapter 7 case that succeeds a failed confirmed plan has greater standing than did the reorganized debtor.

There can be no dispute that a trustee in a chapter 7 case in which no confirmed plan intervened would have standing to bring preference and fraudulent transfer claims. In determining whether a chapter 7 trustee is nevertheless barred from pressing suits as to which standing of the trustee's predecessor chapter 11 debtor has been lost, the court turns first to the language of the Code, the beginning point for any analysis.  *See Toibb v. Radloff*, 501 U.S. 157, 162 (1991).

Conversion occurs pursuant to section 348 of the Code.  Section 348 addresses the effect of conversion on provisions of the Code, dividing Code sections into two categories.  One category consists of events or powers dependent on the date of conversion (Code § 348(b)); the other is triggered by the original commencement of the case or the order for relief (Code § 348(a)).  The latter category is the one which governs provisions not otherwise specifically designated ("except as provided in subsections (b) and (c) of this section, [conversion] does not effect a change in the date of . . . the commencement of the case."  Code § 348(a)).  Code § 541(a) provides for the creation of the estate upon a case's commencement.  Section 541(a) is not mentioned in section 348(b) or (c) and so is not excepted from the general rule of section 348(a).  Clearly, Congress could have made such an exception but chose not to.  Thus, according to the plain meaning rule,[23] when a case is converted from chapter 11 to chapter 7, the estate to

---

[23] *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 157 L. Ed. 2d 1024, 1033-34, 124 S. Ct. 1023, 1030 (2004) ("It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required is not absurd—is to enforce it according to its terms.'") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6, 147 L. Ed. 2d 1, 120 S. Ct. 1942 (2000)).  *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors,*

which the chapter 7 trustee succeeds is the estate, to the extent not actually disposed of, that existed as of the commencement of the case.[24]

As to applicable case law, courts are divided as to whether the property of a debtor revests in the estate when a case is converted to chapter 7 after confirmation. *See In re Lacy*, 304 B.R. 439, 444-45 (D. Colo. 2004). Some courts, on the theory that no property exists in the estate at the time of a post-confirmation conversion, would dismiss a case rather than convert it to another chapter under the Code. *See id.* These cases, however, fail to give effect to the discretion afforded the court by Code §§ 1112(b)(1) and 1112(b)(4)(N) to convert rather than dismiss a case based on a default under a confirmed plan, and other courts have determined that property revests in the chapter 7 bankruptcy estate when a conversion to chapter 7 is ordered post-confirmation. *See id.* Under this theory, property that has not been disposed of by the debtor is reinstated as property of the chapter 7 bankruptcy estate upon conversion. This court finds the reasoning of the latter cases both more persuasive and more consistent with a proper reading of the statute.[25]

---

*Inc.*, 458 U.S. 564, 571 (1982); *U.S. v. Osborne*, 262 F.3d 486, 490 (5th Cir. 2001) ("We give effect to plain, unambiguous language, unless a literal interpretation would produce an irrational result.").

[24] In the TWD Memorandum, the TWD Defendants argue that the Trustee could receive as an estate no more than TWD retained under the TWD Plan. The cases the TWD Defendants cite for this proposition, however, are cases in which the debtor had actually disposed of property over which the post-conversion trustee tried to exercise control. *See, e.g., In re Cybridge Corp.*, 312 B.R. 262 (D. N.J. 2004) (finding that trustee could not avoid post-petition collections of receivables that were replenished by post-petition loans to the extent the credit exceeded the value of the transfer); *In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169 (7th Cir. 1996) (finding that trustee could not recoup payments made subject to an executory contract assumed by the trustee's predecessor).

[25] When a case is closed under Code § 350(a), the case may nonetheless be reopened under Code § 350(b) in order to administer previously unadministered assets provided those assets were not known (and so abandoned (Code § 554(c)) at the time the case was closed. *See* 3 COLLIER ON BANKRUPTCY ¶ 350.03[1] (15th ed. rev. 2008). Where assets are not properly disclosed on the schedules, the assets are not abandoned and may be administered when a case is reopened. *Id.* Surely confirmation of a plan does not create a greater barrier to resurrection of an estate asset than does closing of a case.

The court concludes, then, that conversion to chapter 7 after confirmation is an appropriate alternative to dismissal and is specifically authorized under Code § 1112(b)(1) following a material default of a confirmed plan by a debtor, which establishes cause under Code § 1112(b)(4)(N). Conversion does not change the date of commencement of a case. Code § 348(a). Commencement of a case creates the bankruptcy estate, and what is property of the estate is established at that time. *See* Code § 541(a). Thus, the TWD Claims were property of the estate at commencement of the TWD Case, and unless the TWD Claims were actually disposed of, they were property of the chapter 7 bankruptcy estate following conversion.[26] Even if TWD failed to properly preserve its rights to enforce the TWD Claims, that failure would not be equivalent to disposing of the TWD Claims. Disposal of the TWD Claims would require a judgment, recovery, release, transfer, or equivalent to have occurred. No such disposition of the TWD Claims occurred, and the TWD Claims continued to exist after confirmation of the TWD Plan, whether or not TWD had continued standing to pursue them. Thus the TWD Claims, which were property of the estate at commencement of the TWD Case, are property of the estate following the conversion of the TWD Case to chapter 7.

The court therefore concludes that, whether or not standing to pursue them was preserved for TWD following confirmation of the TWD Plan, the TWD Claims were not disposed of, and they are now property of the chapter 7 bankruptcy estate. The Trustee

---

Further, the TWD Claims are claims either created by federal law (Code § 548) or created under state law as creditor remedies and pursuable by a bankruptcy estate representative pursuant to Code § 544(b)(1). With respect to the latter, at least, presumably a loss of standing through omission in a plan would not affect a creditor's standing—and by extension that of a successor chapter 7 trustee.

[26] In the TWD Case, whether or not TWD preserved the standing to pursue the TWD Adversary, it did not dispose of the TWD Claims. TWD's want of standing—if any—does not mean the TWD Claims, which clearly were property of the estate pre-confirmation, were extinguished. Upon resurrection of the estate pursuant to section 348, the Trustee would regain whatever standing TWD, as debtor-in-possession and estate representative, would have had to pursue the TWD Claims.

may, therefore, enforce the TWD Claims on behalf of the estate for the benefit of the unsecured creditors even if the language in the TWD Plan is insufficient to meet the "specific and unequivocal" requirement of *United Operating*.

### B. Judicial Estoppel

Alternatively, the TWD Defendants argue that they are entitled to summary judgment based on the doctrine of judicial estoppel. Judicial estoppel is an equitable doctrine "that prevents a party from taking inconsistent positions in litigation." *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004); *see also Coastal Plains*, 179 F.3d at 205. Judicial estoppel is intended to keep a party from using deception to benefit itself in litigation. *Superior Crewboats*, 374 F.3d at 334-35.

In the Fifth Circuit, successful invocation of judicial estoppel requires showing three elements: a party, to be estopped, must be urging a position clearly inconsistent with one previously taken; the court must have accepted the previous position; and the inconsistency with the prior position must not have occurred through inadvertence. *Kane*, 535 F.3d at 385-86; *Coastal Plains*, 179 F.3d at 197. In bankruptcy cases, the courts have held that a failure by the debtor to disclose, including in its schedules, a claim that the debtor later seeks to pursue satisfies the first of these elements. *Kane*, 535 F.3d at 386.

In the case at bar, the TWD Defendants argue that TWD failed to schedule its claims against them. However, TWD did list the dividends paid to the TWD Defendants in response to question 23 on its SOFA. While it is true TWD did not reflect on its Schedule B any claims against the TWD Defendants, a debtor is required only to "list . . . property of the *debtor*" (emphasis added) on its Schedule B. *See* Official Form 6B. A

claim for recovery of a fraudulent transfer is not property of the debtor.[27] *See* Code §§ 541, 550 and 548; *In re Advanced Modular Power Systems, Inc.*, 413 B.R. 643, 675 (Bankr. S.D. Tex. 2009). Indeed, the distinction between property of a debtor that becomes property of the estate and fraudulently transferred property that accrues to the estate is clear from their separate categorization in Code §§ 541(a)(1) and 541(a)(3), respectively.

Moreover, though the TWD Defendants insist that TWD did not disclose the potential causes of action against them in the TWD Disclosure Statement, the disclosure there was more than sufficient to trump any assertion of judicial estoppel. In section VI.E. of the TWD Disclosure Statement, TWD disclosed as potential voidable transfer claims approximately $4,000,000 in dividends paid to shareholders. Between this disclosure and the response TWD made to question 23 of its SOFA, there could be little doubt prior to commencement of the TWD Adversary that TWD had and anticipated asserting the TWD Claims.

Thus, even if TWD were still the party pressing the TWD Adversary, the TWD Claims would not be barred by the doctrine of judicial estoppel. However, even if TWD's disclosure of the TWD Claims were inadequate, the Trustee would not be judicially estopped from asserting and pursuing them. In *Kane*, its most recent published opinion addressing judicial estoppel in a bankruptcy context, the Court of Appeals for the Fifth Circuit made clear the distinction between pursuit of an undisclosed claim by a

---

[27] The TWD Adversary does not seek recovery of dividends from the TWD Defendants under Texas Business Organizations Code § 21.316 or under Texas Business Corporations Act Art. 2.41. It is unclear which of these two statutes would apply to dividends paid by TWD on the facts before the court, but as neither was asserted, the court need not determine if TWD's disclosure was sufficient to preserve such a claim.

debtor for its own benefit[28] and pursuit of the same claim for the benefit of creditors. The court noted:

> [The debtor's] nondisclosure in the bankruptcy harmed his creditors by hiding assets from them. Using this same nondisclosure to wipe out [the debtor's claim against the defendant] would complete the job by denying creditors even the right to seek some share of the recovery. *Yet the creditors have not contradicted themselves in court*. They were not aware of what [the debtor] has been doing behind their backs. Creditors gypped by [the debtor's] maneuver are hurt a second time by the district judge's decision. Judicial estoppel is an equitable doctrine, and using it to land another blow on the victims of bankruptcy fraud is not an equitable application.

*Kane*, 535 F.3d at 387-88 (quoting *Biesek*, 440 F.3d 410, 413 (7th Cir. 2006) (emphasis added).

The court concludes that it is clear under *Kane* that, for purposes of applying judicial estoppel, whatever defects may have existed in TWD's disclosure of the TWD Claims were cured upon conversion of TWD's case and the substitution of the Trustee as plaintiff.[29] No more than in *Kane* or *Biesek* should any failure of TWD to disclose the TWD Claims penalize creditors. To so apply the doctrine of judicial estoppel could not be a proper exercise of equity.

### C. Res Judicata

Finally, the TWD Defendants maintain that pursuit of the TWD Claims is barred by the doctrine of res judicata. In their argument, they rely on a series of decisions from the Court of Appeals for the Fifth Circuit. *See Republic Supply Co. v. Shoaf*, 815 F.2d

---

[28] In the TWD Case, TWD was pursuing the TWD Adversary at least in substantial part for the benefit of creditors. *Cf. Coastal Plains*, in which the claim being pursued "would benefit [an insider] in great disproportion to the estate." *Kane*, 535 F.3d at 387.

[29] The court recognizes the distinctions between *Kane* and the case at bar, but those distinctions do not dictate a different result here than that reached in *Kane*.

1046 (5th Cir. 1987);[30] *Howe v. Vaughan (In re Howe)*, 913 F.2d 1138 (5th Cir. 1990);[31] and *Eubanks v. FDIC*, 977 F.2d 166.  These cases stand for the proposition that, through the doctrine of res judicata, a final order confirming a plan of reorganization bars litigation of a matter that could have and should have been asserted earlier in the proceeding.  *See Howe*, 913 F.2d at 1147.  The TWD Defendants, however, ask more of the doctrine of res judicata than it can deliver.

First, where, as here, an intent to pursue a claim post-confirmation has been manifested in both the confirmed plan and its associated disclosure statement, the res judicata effect of confirmation would not, under *Howe* and *Eubanks*,[32] preclude pursuit of those claims.  In *Howe* and *Eubanks*, unlike the case at bar, the plans made no reservation of the suits later found to be precluded.  Indeed, in each case, the Court of Appeals was concerned by the apparent blind-siding of the defendants by the commencement of suit following confirmation of a plan that presumably had fully dealt with the disputes between the debtors and those defendants.  *Howe*, 913 F.2d at 1144-45; *Eubanks*, 977 F.2d at 172.

Second, in *Howe* and *Eubanks*, the suits barred were being pursued not for the benefit of creditors but rather for the benefit of the rehabilitated debtors.  In the case at bar, the TWD Claims were preserved to be pursued for the benefit of (initially, in part) creditors.  For the court to extend the preclusive effect of res judicata to the TWD Claims

---

[30] *Shoaf*, in turn, relied on *Stoll v. Gottlieb*, 305 U.S. 165 (1938).

[31] *Howe* was cited with approval in *Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.)*, 200 F.3d 382, 388 (5th Cir. 2000).  However, like another of *Shoaf's* predecessors, *Southwest Props. v. Charles House Corp.*, 742 F.2d 862 (5th Cir. 1984), the application of the res judicata doctrine did not there turn on an order confirming a plan; *Osherow* is thus clearly distinguishable from the case at bar.

[32] *Shoaf* and *Stoll* involved assertion of res judicata to preclude pursuit by a creditor of an action barred by the confirmed plan and so are different in the manner of the application of the doctrine than *Howe*, *Eubanks*, and the instant case in which res judicata is urged as a bar to pursuit of an action by a post-confirmation estate representative.

asserted in the TWD Adversary would require the court to conclude that confirmation of a plan cuts off the ability to initiate *any* cause of action that might have been brought prior to confirmation.  The doctrine of res judicata, as enunciated in *Howe* and *Eubanks*, is not so broad.  Indeed, such an application of a doctrine of issue preclusion would fly in the face of Congress's clear intent, as expressed in Code § 1129(b)(3)(B); if Congress provided for "the retention and enforcement . . . by a representative of the estate . . . of any . . . claim" under a plan, it surely did not intend that confirmation of a plan would extinguish such claims.

Third, *Howe* and *Eubanks* are inapposite to the case at bar.  In each of those cases, the defendants were central participants in the reorganization process whose claims were specifically dealt with by negotiation and dispute, leading ultimately to their resolution in the plan.  "In [*Eubanks*], all of the claims [asserted post-confirmation were] based on the same transaction that gave rise, in part, to the terms of the Plan, and the order confirming the Plan was based, in part, on the transaction at the core [of those claims]."  *Eubanks*, 977 F.2d at 172.  *See*, similarly, *Howe*, 913 F.2d at 1146-47: "the Howes disclosed and specifically treated [the principal defendant] in their confirmed plan, and [that defendant] was their only significant creditor . . . Every facet of [that creditor's] loan was the subject of litigation and negotiation."[33]

In the instant case, the TWD Defendants' relationship with TWD was hardly central to TWD's chapter 11 case.  Under the TWD Plan, the TWD Defendants, as

---

[33] The implication of the treatment of the defendants under the plans in each of *Howe* and *Eubanks* was clearly that any affirmative claims the debtor might have against those defendants would be settled through plan confirmation.  *Cf.* Code § 1123(b)(3)(A).  As the Court noted in *Howe*, where, as there, a plan specifically deals with a given claim, the clear implication is that the plan resolves associated disputes. *Howe*, 913 F.2d at 1147, n. 30 (the court stated that "[t]he result might well have been different . . . had Premier's claim not been specifically dealt with in the plan.").

shareholders, were wiped out and not even entitled to vote on the TWD Plan. *See* TWD Plan at section 5.1; Code § 1126(g). At no point, to the court's knowledge, did TWD and the TWD Defendants engage in negotiations or litigation that could have led Defendants to believe—as was true in *Howe* and *Eubanks*—that the TWD Plan resolved any claims TWD's estate might have against them. Quite the contrary, as discussed above, the TWD Plan clearly left open the possibility that the TWD Defendants would be subject to future litigation.

Fourth, in *Howe*, the debtors had commenced suit against the principal defendant prior to filing of their plan. 913 F.2d at 1146. As part of the deal that resulted in the confirmed plan, that suit was dismissed. In *Eubanks*, suit also was commenced prior to confirmation (but after filing of the plan) against one of the defendants (977 F.2d at 168), which suit was thereafter dismissed voluntarily by the debtor. In the instant case, there was no such commencement and abandonment of litigation against the TWD Defendants.

Finally, the Court of Appeals in *Howe* suggested several factors for determining whether, in a case like that at bar, a cause of action should be precluded. *Howe*, 913 F.2d at 1147, n. 28. First, the court should consider whether the earlier, preclusive proceeding was an adversary proceeding or a contested matter. Here, confirmation of the TWD Plan was a contested matter (FED. R. BANKR. P. 3020(b)(1)) and pursuit of the TWD Claims required commencement of an adversary proceeding.[34] This factor does not favor

---

[34] The difference between a plan having res judicata effect as to a potential suit and a plan not precluding such a suit is well-illustrated by two decisions by the Fifth Circuit Court of Appeals in chapter 13 cases. In *In re Chesnut*, 2009 WL 4885018 (5th Cir.), the Court concluded that confirmation of the debtor's plan precluded a later assertion by a creditor that property dealt with by the plan was the separate property of the debtor's non-filing spouse. In *In re Simmons*, 765 F.2d 547 (5th Cir. 1985), the Court held characterization in a plan as unsecured of the claim of a creditor claiming secured status was ineffective to void the creditor's lien, something that would require the more rigorous process afforded by an adversary proceeding or a claim objection.

applying the doctrine of res judicata to bar the TWD Claims.  Second, the court should look to the "nexus between the plan and the claim being asserted." *Id*.  The court understands this factor as requiring inquiry into what effect the TWD Plan had on the TWD Claims and the TWD Defendants; as the TWD Plan preserved the TWD Claims for prosecution rather than dealing with them or adjusting the TWD Defendants' rights, this factor also weighs against applying the doctrine of res judicata to bar the claims.  Finally, the court should consider the timing of assertion of the potentially precluded claims.  In the case at bar, the court finds nothing in the timing of the commencement of the TWD Adversary that would cause it to favor preclusion of the TWD Claims.

In short, the TWD Claims were preserved for future assertion in the TWD Plan. Nothing in the applicable precedents suggests that they were disposed of through the confirmation order.  They are thus not barred by res judicata.

## VI.    Conclusion

The court holds that the Trustee may enforce the TWD Claims against the TWD Defendants and that none of the defenses asserted by the TWD Defendants prevents the Trustee from doing so.  TWD properly preserved standing by providing appropriate language in the TWD Plan that meets the requirements of *United Operating*.  This alone is sufficient to permit pursuit of the TWD Claims.  But the court further holds that even if the language of the TWD Plan were found to be insufficient to meet the *United Operating*, the Trustee nonetheless has standing to pursue the TWD Claims because the TWD Claims revested in the bankruptcy estate upon conversion to chapter 7.  The court concludes that the TWD Claims were not disposed of by TWD and that, because they

were property of the estate at commencement of the TWD Case, they were property of the estate upon conversion.

The court further holds that neither of the doctrines of judicial estoppel and res judicata prevents the Trustee from pursuing the TWD Claims on behalf of the estate and the unsecured creditors. The court holds that judicial estoppel is inappropriate to prevent the Trustee from pursuing the TWD Claims to the extent that recovery on the TWD Claims benefits the estate and the unsecured creditors. Judicial estoppel is inappropriate to create a windfall for the TWD Defendants or to create a barrier to recovery for the unsecured creditors.

The court further concludes that the doctrine of res judicata fails to prevent the Trustee from pursuing the TWD Claims. The intent to pursue the TWD Claims was apparent in the language of the TWD Plan and the TWD Disclosure Statement. None of the factors in *Howe* and *Eubanks* weighs in favor of applying the doctrine res judicata to preclude the TWD Claims. Thus the court holds the TWD Claims were not disposed of by confirmation of the TWD Plan.

The court concludes that while the language in the Ranzino-Renda Plan, by itself, failed to preserve the Ranzino-Renda Claims for pursuit against the Cook Defendants, the Ranzino-Renda Disclosure Statement should be viewed in conjunction with the Ranzino-Renda Plan. The court holds that, together with the Ranzino-Renda Disclosure Statement, the language in the Ranzino-Renda Plan preserves the Ranzino-Renda Claims for pursuit by Ranzino-Renda against the Cook Defendants but not against the Campbell Defendants.

Except to the extent that evidence heard in trial of the Ranzino-Renda Adversary supports the court's conclusion that Ranzino-Renda should have identified her claims against the Campbell Defendants to preserve standing to pursue those claims, the court has not evaluated the merits of either the TWD Claims or the Ranzino-Renda Claims. Nothing in this memorandum opinion should be construed as comment on the merits of any of those claims.

Counsel for each of the Trustee and Ranzino-Renda are directed to submit an appropriate order to the court denying the TWD Motion and the Cook Motion, respectively.